IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.             CRIMINAL ACTION NO. 2:14-cr-00065

CARL TAYLOR, and,
PATSY TAYLOR,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Defendants Carl Taylor and Patsy Taylor are charged with conspiracy to distribute oxycodone. On May 14, 2014, the Court held a hearing on Defendants' pending motions to suppress [ECF 29 and 30]. Defendants subsequently filed motions to supplement the record of the suppression hearing [ECF 60 and 61]. Those motions are unopposed. For good cause shown, Defendant's motions to supplement the record of the suppression hearing [ECF 60 and 61] are **GRANTED**. For the reasons that follow, the Court **DENIES** Defendants' motions to suppress [ECF 29 and 30].

*I. BACKGROUND*[1]

On the morning of January 4, 2013, Detective J. A. Hackney, a police officer with the Charleston Police Department assigned to the Metropolitan Drug Enforcement Network Team (MDENT), was performing a package interdiction at a U.S. Post Office in Charleston, West Virginia. Package interdiction involves identifying packages that may contain narcotics. One envelope in particular drew Detective Hackney's attention that morning. It had several indicia of a typical package containing narcotics: it was an Express Mail package; it had hand-written label; it was shipped overnight from Michigan, a known drug source state for West Virginia; and no signature was required upon delivery.

After picking up the soft-sided envelope, Detective Hackney testified that he

---

[1] The following facts were adduced from testimony of Detective J. A. Hackney and Inspector R. DiDomenico at the motion hearing and from the exhibits submitted by the parties and are essentially uncontested. Pursuant to Defendants' motions to supplement the record of the suppression, the Court has admitted two additional documents into evidence. The first is a Police Canine Use Report that was prepared in error by Detective Hackney, in which he asserts that on January 4, 2013, while he and Postal Inspector Mehall were conducting parcel interdiction, he conducted a canine sniff on the package. (ECF 60-1 at 1.) The report asserts that, after the dog alerted to the presence of drugs in the package, Detective Hackney and Inspector Mehall conducted a controlled delivery. (*Id.* at 1.) The second document is a letter by the Government explaining that the Police Canine Use Report in question was drafted by Detective Hackney in error. The letter explains as follows:

> Detective Hackney has explained that at the end of January 2013, he was checking the log of cases in which he had participated during that month to ensure that he had complied with all reporting requirements. At that time, Detective Hackney noticed that a Canine Use Report had not been completed for the case involving Carl and Patsy Taylor. Detective Hackney assumed that a canine had been used during the course of the Taylor investigation, and completed the report based on that mistaken assumption. No canine was used during the course of the Taylor investigation and Postal Inspector Mehall was not involved in the investigation. After completing the report, Detective Hackney signed and dated the report for the day that the investigation involving the Taylors began.

Defendant Carl Taylor's motion asserts that "because the burden rests with the Government on all three grounds for suppression, the credibility of the investigating officer is necessarily material and relevant." (ECF 60 at 1.) Defendant Patsy Taylor's motion asserts that the evidence "will be helpful to the Court in determining the credibility of the lead investigator in this matter." (ECF 61 at 1.) Nevertheless, during the motions hearing, Detective Hackney did not testify that a dog sniff had been conducted, nor did he testify that Inspector Mehall had participated in the investigation. The Court observed Detective Hackney squeeze the package addressed to Defendant Carl Taylor and found his testimony as to the crunching sound produced by the squeeze to be credible. Detective Hackney's testimony at the motions hearing has not been contradicted as to any other matter. Therefore, there do not appear to be any contested factual issues as to which a credibility determination would be pertinent.

> felt a smaller box inside of the envelope. At that time, I squeezed or pressed on that box and I felt a crunch or the moving of what I thought to be pills. Not that I could feel individual pills, but when you pressed on it, you could feel . . . a crunch and then . . . objects moving that is similar to what I have felt before as being pills.

(ECF 40 at 18.)[2] Detective Hackney next investigated the address of the sender, "O. Carter," finding that the sender address and sender name did not coincide, another common indicator that a package may contain narcotics. Finally, upon investigating the address of the recipient, Detective Hackney learned that the receiving address had been previously investigated for drug activity.

Based on this information, without a warrant, a controlled delivery was arranged. Detective Hackney and Postal Inspector Fluharty, who wore plain clothes, parked just up the street from Defendants' house in an unmarked gray Jeep Cherokee. Postal Inspector R. DiDomenico, who was also wearing plain clothes, parked across the street from Defendants' house in a gold minivan. Four other MDENT police officers were positioned around the house to observe if anyone left the house, but they were not in view of the front door.

Postal Inspector DiDomenico approached Defendants' home and knocked on their front door. Defendant Carl Taylor opened the door. After he accepted delivery of the package, Detective Hackney and Postal Inspector Fluharty exited their car, approached Defendant Carl Taylor, and identified themselves. Defendant Cary Taylor then invited Postal Inspector DiDomenico, Postal Inspector Fluharty, and Detective Hackney to come inside his home.[3]

---

[2] At the motions hearing, the Express Mail package and its contents were reassembled. Detective Hackney was instructed to squeeze the package in the manner in which he squeezed it on January 4, 2013. Upon doing so, Detective Hackney testified that he "can feel where the pills are and you can feel them crunch when you squeeze it together." (ECF 40 at 22.) "Not that I could feel individual pills, but just the separation and crunch, I've had it happen on two other occasions, and it was pills that were involved." (*Id.* at 23.)

[3] Detective Hackney testified that Defendant Carl Taylor asked them , "Can you all come inside?" (ECF 40 at 61.) Postal Inspector DiDomenico testified that he "said something to the effect of, 'Come on in.'" (*Id.* at 97.)

As they entered the house, Detective Hackney asked Defendant Carl Taylor if there was anybody else inside the residence with him. Just his wife and his dogs, Defendant Carl Taylor responded. Detective Hackney requested permission to walk through the residence to ensure that no one else was present. Defendant Carl Taylor gave consent. The three officers and Defendant Carl Taylor entered Defendants' bedroom, where Defendant Carl Taylor's wife, Defendant Patsy Taylor, was on or in her bed, wearing a T-shirt and shorts.

Standing around the bedroom door or just inside the door to the bedroom, Detective Hackney told Defendants that he was there because of the package. He asked Defendant Carl Taylor if he was expecting the package. Defendant Carl Taylor replied that a friend had sent the package, which was supposed to contain medicine.

Detective Hackney asked for consent to open the soft-sided Express Mail envelope that was earlier delivered to him, and Defendant Carl Taylor gave consent. Postal Inspector DiDomenico opened the package. Inside was a rectangular cardboard Priority Mail box approximately an inch and a quarter thick and several inches in length and width. In the box was a soft gift-wrap envelope, within which was a Ziploc bag containing oxycodone pills. Detective Hackney asked Defendant Carl Taylor if those were the pills he was expecting, and he replied that they were.

Detective Hackney also asked Defendant Patsy Taylor questions about money she had in her purse and pills that were in a pillowcase and asked her to remove both.

Detective Hackney then requested permission to search the residence. Defendants, who were then sitting on the bed in the bedroom, both gave oral consent. The four other MDENT officers who had been outside came inside and began to search the residence. Two were in uniform, and two were not.

Soon thereafter, Detective Hackney asked Defendants, "Can we go in the kitchen?" The three moved from the bedroom to the kitchen area, where they sat down and talked.

Defendant Patsy Taylor signed a standard MDENT consent to search form, which granted consent for MDENT to search the residence as well as a vehicle parked outside of the house. Because Defendant Patsy Taylor told Detective Hackney that she had trouble reading, he read the form to her verbatim. Although Detective Hackney did not expressly explain to Defendant Patsy Taylor what MDENT stands for, he testified that he had earlier explained to her who he was and who he worked for. Detective Hackney informed Mrs. Taylor that she had the right to refuse consent and that she had the right to tell him to get out of her house. Detective Hackney asked Defendant Patsy Taylor if she had any questions, and she said that she did not. He then instructed her that if she understood it, and still agreed with everything, to sign by the "X" on the form, which she did.

Defendant Carl Taylor had left the room to go to the bathroom during this time. When he returned, Detective Hackney showed Defendant Carl Taylor the form signed by his wife and asked him if it was still okay with him that they were there. Defendant Carl Taylor said "yes." Detective Hackney was the only officer present while Defendant Patsy Taylor signed the consent to search form, although Inspectors DiDomenico and Fluharty came and went.

Detective Hackney Mirandized Defendants and asked them if they wanted to give a statement without an attorney present. Defendants stated that they wanted to cooperate and "do the right thing." (ECF 40 at 33, 73, 85.)

Defendants made several admissions about their involvement with the distribution of oxycodone. Detective Hackney testified that Defendants were very cooperative. While the conversation proceeded in the kitchen, the other officers performed a search of the house.

5

Defendants were never told that they were not free to move about the house, and Defendants never objected to any actions taken by the officers in their home.

## I. DISCUSSION

Defendants seek to suppress the contents of the mail parcel delivered to their residence, any statements attributed to Defendants during their encounter with law enforcement, and any evidence recovered from the search of their home.

### A. *Detective Hackney's Squeezing of the Envelope was Not an Unreasonable Search*

Defendants argue that Detective Hackney's squeezing of the Express Mail envelope addressed to Defendant Carl Taylor constituted an unreasonable search in violation of the Fourth Amendment. They ask the Court to suppress all evidence obtained after the alleged search of the envelope's contents, as the fruits of a warrantless search. The Court finds that the squeezing of the envelope did not constitute an illegal search.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND IV. Letters and other sealed packages are "effects" within the meaning of the Fourth Amendment, and warrantless searches of such effects are presumptively unreasonable. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). Government action amounts to a search when it invades a legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). The sender and addressee of a piece of mail have a legitimate expectation of privacy in the contents of the mail even though they may not be in physical possession of the mail while it is en route. *United States v. Givens*, 733 F.2d 339, 341 (4th Cir.1984). However, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967).

The Express Mail package was addressed to Defendant Carl Taylor, although its alleged search is challenged by both Defendants. At the motions hearing, Defendant Patsy Taylor asserted standing to do so solely on the basis of the fact that the instant offense is charged as a conspiracy. However, to challenge a search under the Fourth Amendment, a defendant must have a "reasonable expectation of privacy" in the place that was searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "Fourth Amendment rights are . . . personal rights," which co-defendants "lack standing to assert vicariously." *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988). The Supreme Court has rejected a co-conspirator exception to the rule regarding who may challenge the constitutionality of a search or seizure. *See United States v. Padilla*, 508 U.S. 77, 82 (1993). A co-conspirator does not have standing to object to a search unless that co-conspirator has a reasonable expectation of privacy, independent of other co-conspirators' interests, in the place to be searched. *Id.* Because that does not appear to be the case here, Defendant Patsy Taylor lacks standing to object to the squeezing of the package.

Defendant Carl Taylor argues that Detective Hackney conducted a search of the Express Mail envelope addressed to Taylor when he squeezed it to the point that he could feel a crunch and the moving of what he thought to be pills. Defendant relies first on *United States v. Bond*, 529 U.S. 334 (2000). In *Bond*, the Supreme Court held that a law enforcement officer's squeezing "in an exploratory manner" of a bus passenger's soft-sided carry-on bag placed in an overhead storage space above his seat violated the Fourth Amendment's proscription against unreasonable searches. *Id.* at 335 & 399. Noting that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection," the Court proceeded to consider whether the kind of touching engaged in by the officer exceeded the kind of contact the defendant could have

7

expected from other passengers or bus employees. *Id.* at 338–339. As the *Bond* Court explained,

> Our Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.

*Bond*, 529 U.S. at 338 (citations omitted) (internal quotation marks omitted). As to the first question, the Court noted that the defendant had sought to preserve his privacy by using an opaque bag and placing the bag directly over his seat. *Id.* As to the second, the Court noted that, although a bus passenger expects a bag placed in an overhead bin to be handled by other passengers or bus employees, he does not expect that it will be felt "in an exploratory manner." *Id.* at 338–39.

"The Supreme Court based its decision in *Bond* on the specific facts of the case, that is, a person traveling by bus with a closed bag stowed in the luggage compartment overhead." *United States v. Johnson*, No. 07-30955, 2008 WL 3876550, at *2 (5th Cir. Aug. 21, 2008). Courts have relied on *Bond* to find a reasonable expectation that luggage will not be felt in an exploratory manner from the outside when that luggage is traveling in a place exposed to the public but near to the defendant's person,[4] or stowed in a place not accessible to the public, such as a closet.[5] The Court has been unable to find any reported cases in which *Bond* has been applied in the context of the squeezing of a mail package, and the Court finds *Bond* to be distinguishable from this case. The defendant in *Bond* had his luggage within his reach, where he could at all times keep an eye on it and exercise control over it. Thus, notwithstanding the fact that his bag was

---

[4] *See*, *e.g.*, *United States v. Sparks*, 287 F. App'x 918, 920 (2d Cir. 2008); *MacWade v. Kelly*, 460 F.3d 260, 272–73 (2d Cir. 2006); *United States v. Ellis*, 330 F.3d 677, 681 (5th Cir. 2003).

[5] *See*, *e.g.*, *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005); *Pennsylavnia v. Perel*, 2014 Pa. Super. 283 (Pa. Super. Ct. Dec. 23, 2014).

soft-sided, and notwithstanding the fact that he would have expected some handling of his luggage by third parties, it was reasonable for the defendant in *Bond* to expect that his luggage would not be felt by third parties in an exploratory manner. The expectation of privacy from exploratory surface touching is much greater in an item that is within the owner's immediate physical control than in an item that someone entrusts to an unknown number of third parties for delivery two states away.

Defendant Carl Taylor may have had a subjective expectation of privacy in the contents of a package of which he was the intended recipient and which was sealed and opaque. Although the Express Mail envelope was soft-sided, it contained a small cardboard box, suggesting that the sender may have sought to preserve as private the tactile properties of the pills inside. However, a cardboard box is not as sturdy as a plastic box, and one traveling through the mail can be expected to develop some "give" to it, if it did not already have it at the outset. The package was not opened, perforated, or breached, but merely compressed. An expectation that the flexible outer packaging of an item handed over to postal employees will not be squeezed, even deliberately, when handled by them is simply not "one that society is prepared to recognize as reasonable." *Bond*, 529 U.S. at 338. Detective Hackney's squeezing of the box did not exceed the kind of contact that Defendant Carl Taylor could have expected.

In addition, Detective Hackney squeezed Defendant Carl Taylor's Express Mail envelope because it matched the profile for a package that may contain illegal narcotics. Thus, "unlike the agent in *Bond*, the officer[] in this case had a reasonable belief that [it] could contain contraband before ever touching it." *United States v. Flowal*, 234 F.3d 932, 935 (6th Cir. 2000). *Cf. also United States v. Allman*, 336 F.3d 555, 556-57 (7th Cir. 2003) (Posner, J.) ("When we consider that all persons, with all their belongings, who travel by air are subject to search without a

warrant . . . we have trouble making sense of a rule that would forbid such a search if a parcel is traveling by itself, also by air, as part of a mail shipment.").

Defendant Carl Taylor also relies on *United States v. Jones*, 132 S.Ct. 945, 949 (2012), in which the Supreme Court held that the attachment of a GPS tracking device to a vehicle, and the subsequent use of that device to monitor the vehicle's movements on public streets over the course of 28 days, was a search within meaning of Fourth Amendment. In *Jones*, the Supreme Court found that the Fourth Amendment's proscription of unreasonable searches was violated when the "Government physically occupied private property for the purpose of obtaining information." *Id.* at 949. A year later, the Supreme Court held in *Florida v. Jardines* that when "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." 133 S. Ct. 1409, 1414 (2013) (citing *Jones*, 132 S.Ct. at 950–51, n.3). Applying this "traditional property-based understanding of the Fourth Amendment," *id*. at 1417, the *Jardines* Court held that "using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment," *id.* at 1413. The Court explained that by going onto the home's front porch, the officers had undoubtedly entered the home's curtilage—that is, the "area immediately surrounding and associated with the home" that is treated "as part of the home itself for Fourth Amendment purposes." *Id.* at 1414. Defendant contends that Detective Hackney's squeezing of the package addressed to him in an attempt to feel its contents constituted a physical intrusion on his property. The Court is not convinced.

While the officer in *Jardines* entered boundaries of the defendant's porch, Detective Hackney did not penetrate the boundaries of Defendant Carl Taylor's package. By pressing down with his fingers on the flexible outer sides of the Express Mail envelope and of the

10

cardboard box within, Detective Hackney did not physically enter the package. He did not open the package, nor did he breach its sides. While a GPS device in *Jones* was attached to the defendant's car, Detective Hackney did not attach anything to Defendant Carl Taylor's package. Briefly compressing, without breaching, the outer walls of a package's flexible packaging material does not constitute a "physical occupation" or "physical intrusion" of the sort described in *Jones* and *Jardines*.

Accordingly, the Court finds that Detective Hackney's squeezing of the Express Mail envelope did not constitute an unreasonable search.

### B. Defendants' Statements Were Not Obtained in Violation of *Miranda*

Defendants' second argument is that the Fifth Amendment was violated, as no Miranda warning was given to Defendants before they made several incriminating statements. Defendants seek to exclude both their pre-*Miranda* warning and post-*Miranda* warning statements to law enforcement.

Miranda warnings are required when a suspect in custody is subjected to interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks omitted). The key question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Id.* at 422. Facts relevant to this determination include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential

display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010).

Here, all statements were made during the daylight hours in Defendants' own home, where Defendant Carl Taylor had invited the initial three officers. These officers were with Defendants when they made statements in their bedroom. However, all three were wearing street clothes and did not have visible weapons, and the husband-and-wife Defendants were together throughout this encounter. Seven officers, including two in uniform, were in their home when Defendants made statements in their kitchen. However, only one plainclothes officer was with them throughout most of the interview in the kitchen. Although two uniformed MDENT officers may have been carrying a visible gun while searching the home, no gun was ever drawn. Defendants were never placed in handcuffs. Defendants were never restrained nor told that they were not free to move around, and Defendant Carl Taylor moved freely to the bathroom. Finally, Defendants were at all times cooperative, and there is no indication that the officers' demeanor was other than cordial.

Under the circumstances, the Court finds that Defendants were not in custody at the time they made any of the statements challenged here.

*C. Defendants' Consent to Search Their House was Valid*

Defendants' final argument is that the warrantless search of their house was not pursuant to valid consent.

Valid consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The Government bears the burden of establishing that it obtained valid consent by a preponderance of the evidence. *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007). Consent to search is valid only if it was

knowing and voluntary and courts assess validity based on the "totality of the circumstances." *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001) (citing *United States v. Mendenhall*, 446 U.S. 544, 557, (1980)). Factors informing a court's analysis include the accused's personal characteristics (e.g., age, maturity, education, intelligence, and experience) and the circumstances under which the consent was given (e.g. the police officers' conduct, the number of police officers present, and the duration, location, and time of the encounter). *United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997).

At the time when both Defendants gave oral consent, they were in their bedroom together during the daylight hours with three plainclothes officers who did not have any weapons visible. Defendants were at all times cooperative, and there is no indication that the officers' demeanor was other than cordial. The officers did not use any coercive tactics, nor did they ever threaten Defendants. Although Patsy Taylor was unable to read the written consent form, it was read to her verbatim, and she did not have any questions. Before Defendant Patsy Taylor signed the consent form, she was informed of her right to withhold consent. After she signed the form, Defendant Carl Taylor was also asked for his continued consent to search the home, making it sufficiently clear that he had the right to withdraw his consent.

Although Defendants are adults, the Court previously held two hearings as to Defendant Patsy Taylor's competence to stand trial. The Court found Defendant Patsy Taylor mentally competent to understand the nature and consequences of the proceedings against her and to assist properly in her defense. However, the Court received copies of two forensic evaluations of Defendant Patsy Taylor disclosing that Defendant Patsy Taylor did not complete the ninth grade and has significant impairments in her cognitive abilities and verbal comprehension.

Considering the totality of the evidence, the Court finds that Government has met its burden in showing that Defendant Carl Taylor gave valid consent. Although it might be a closer call as to whether Defendant Patsy Taylor gave valid consent to search the house, as a co-occupant of the house, Defendant Carl Taylor's valid consent was sufficient to authorize the search. Authority to consent rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Although third party consent is not valid as to a defendant who is physically present and refuses to consent, *Georgia v. Randolph*, 547 U.S. 103, 120 (2006), neither Defendant objected to the search of their home.

Accordingly, the search of Defendants' home was pursuant to valid consent.

## II. CONCLUSION

For these reasons, Defendant's motions to suppress [ECF 29 and 30] are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, and the United States Probation Office.

ENTER: February 27, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE